TERRAZAS v. HOLMES et al.   (No. 1129.)

(Court of Civil Appeals of Texas. El Paso. Nov. 11, 1920. Rehearing Denied Dec. 16, 1920.)

1. War ⬥12 — Decree of revolutionary general construed as confiscatory.

Decree of the Mexican revolutionary general Francisco Villa *held* to have divested the title of persons named in the decree to the properties therein specified, and to have vested title in the revolutionary government.

2. Treaties ⬥8 — Hague prohibition against confiscation does not apply to civil warfare.

The prohibition of the Hague treaty against the confiscation of private property or land does not apply to civil warfare, to render nugatory a confiscatory decree of a Mexican revolutionary general.

3. Constitutional law ⬥77 — No question of forfeiture under forms of civil law involved in arbitrary confiscation.

Declaration by the heads of the Mexican revolutionary government, Gens. Carranza and Villa, that the properties of persons named were taken for the purposes and the reasons designated in the decree, involves no question of forfeiture under the forms of civil law, constituting an arbitrary act of confiscation, and is not void under the provision of the Mexican Constitution vesting in the legislative department the power to pass laws, irrespective of revolution.

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. International law ⬤⟿4—Confiscatory acts of foreign revolutionary government validated by its recognition.**

Where the Mexican revolutionary general Carranza approved his fellow general Villa's decree confiscating property, thus making such decree his own, and the property was subsequently taken into possession by his forces, such confiscatory acts were validated, for purposes of a suit in the courts of Texas, by the act of the United States government in recognizing the Carranza government.

**5. Replevin ⬤⟿69(2)—Plaintiff, pleading ownership and right to possession, must prove one or other.**

Plaintiff, having pleaded ownership and right to possession of cattle as basis of his right to recover them, before he can do so, must prove one or the other; in such case defendant could rely on a general denial; and, when plaintiff failed to prove his right to recover, defendant need not have attempted to prove title in another, to recover judgment that plaintiff take nothing.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Suit by Luis Terrazas against George M. Holmes and others. From judgment for defendants, plaintiff appeals. Affirmed.

Davis, Goggin & Loftus, of El Paso, for appellant.

F. G. Morris, of El Paso, for appellees.

HARPER, C. J. November 15, 1915, Luis Terrazas brought this suit against George Holmes and John Gardner for, and sequestered, 1,306 head of cattle, alleging ownership to be in plaintiff. Defendants replevied the cattle. Upon trial before the court, judgment was rendered for defendants, from which plaintiff has perfected his appeal.

The trial court made findings of fact and conclusions of law as follows:

"Findings of Fact.

"In the year 1910, during the time that Gen. Porfirio Diaz was constitutional President of the republic of Mexico, there was a revolution started in Mexico, of which Francisco Madero was chief. This revolution resulted in the resignation of Gen. Diaz, who thereupon left the republic of Mexico. Madero's revolution was successful, and he acquired control of affairs in Mexico, and was thereafter elected President of Mexico. On February 23, 1913, Francisco Madero, the President of the republic, was assassinated, and Gen. Victoriano Huerta seized the reins of government, and proclaimed himself as in control of Mexico. Venustiano Carranza, then Governor of the state of Coahuila, arose in arms against the Huerta government, and there was a military conflict between them. The movement directed by Carranza was successful in the north, and the military forces under Carranza, by the latter part of the year 1913, obtained complete control over the state of Chihuahua. Gen. Francisco Villa

was the principal military commander under Carranza, and prominent in the military operations against Huerta. When military control was obtained over the state of Chihuahua, Francisco Villa was named Military Governor thereof.

"The plaintiff, Gen. Luis Terrazas, is a citizen of the republic of Mexico, and had been, up to the date of the Madero revolution, Constitutional Governor of the state of Chihuahua. He was at all times an adherent of the Diaz government, and was a soldier of distinction and ability, and a man of great weight and importance in both political and business affairs in the state of Chihuahua and throughout the republic of Mexico. He remained in the state of Chihuahua, at the capital thereof, until the evacuation of Chihuahua by the Huerta forces, then in command of Gen. Mercado. When the Mercado forces evacuated Chihuahua, Gen. Terrazas left with them overland to Ojinaga, where he crossed into the United States. Since said time Gen. Terrazas has been a resident of the United States, and has not returned to Mexico. During his residence in Mexico, Gen. Terrazas acquired great wealth. He owned several very extensive cattle ranches in the state of Chihuahua, on which he owned cattle in excess of 190,000 head. These cattle were on his ranches in Chihuahua at the time he fled from Mexico. The ranches and cattle were taken possession of by the military forces of Carranza and Villa on their obtaining control of the state of Chihuahua.

"Villa, by authorization of Carranza, who was chief of the revolutionary movement, caused to be made and promulgated a degree of confiscation. This decree of confiscation is in the Spanish language. The following, however, is a substantial translation of same:

" 'Decree Relative to the Confiscation of Property.

" 'Gen. Francisco Villa, First Chief of the Constitutionalist Army in the state of Chihuahua, and in conformity with the Plan of Guadalupe, Provisional Governor of the said state, in pursuance to the extraordinary powers conferred upon me, I have deemed it best to decree as follows:

" 'Having sufficient proof relative to the intervention of various capitalists of the state, in the late difficulties that our country has been called upon to decide, producing, on account of natural defense against the exploitations and treasons, numerous victims, among whom are orphans and widows, who mourn the loss of those who were the support of those innocent beings. whose only crime was the enviable patriotism which has sustained the dignity of our country, and there being found also among them those wickedly enriched, who have defrauded by a thousand means the public treasury during more than half a century of power, by fraud and force, I believe, in justice, that the hour has arrived to render account to public vengeance, instituting in due time the procedures before which there shall be accounted for all the responsibilities that were contracted in the presence of the Mexican people. And as on former occasions it has been fully proved that the possession of their in-

terests has only served to purchase traitors and assassinate rulers whose excessive goodness served as an incentive to their evil deeds, it is necessary, in order to save our nation, to uproot the evil, to put in force, among other proceedings for the public good, according as it may appear necessary, confiscation of properties belonging to those wicked Mexicans who have traded in human life, and who are the immediate cause of the shedding of our blood. For said reasons, which justify our attitude before the dignity of the entire world, I decree the following:

" 'First: That they are confiscable and are confiscated for the public good and for the purpose of providing pensions for the widows and orphans made so by the defense that the Mexican people have made against the enemies of the administration, and in order to meet the liabilities arising from court procedures, and which judgments or decisions in due time will be made known by special courts, which courts for the purpose of restoring fraudulently acquired properties will be established at suitable places, fixing the amount of those liabilities, and assigning as a whole for those purposes, the personal and real properties and securities of every class belonging to the following parties: Terrazas (Luis) and sons, Creel brothers, Falomir brothers, Jose Maria Sanchez, Cuilty brothers, Lujan brothers, J. Francisco Molinar, and all their households and other associates who have been interested with them in the dirty transactions and fraudulent co-operations which in former times were called politics.

" 'Second: A regulative law, which shall be enacted at the triumph of our cause, shall determine the relative and equitable distribution of those properties, first pensioning the widows and orphans whose relatives may have defended the cause of justice since 1910; second, there shall be considered the defenders of our cause in the proper division of those lands; there shall be made good the loss of the treasury on account of frauds committed by the parties mentioned, by failure to pay taxes during the many years that said conditions existed, and also there shall be restored to the legitimate and original owners the properties which through weight of power were taken from them by said parties, in this manner doing justice to each victim of the usurpation.

" 'Third: All the confiscated properties shall be administered by the State Bank, which shall keep an exact account, correctly vouchered, of the receipts and disbursements made for said purpose.

" 'Given at the Executive Palace, this the 12th day of December, 1913.

" 'General Francisco Villa.
" 'Military Governor of the State.
" 'S. Terrazas, Secretary.'

"The purpose of this decree was to divest the title of the persons named in said decree to the property therein specified, and to vest same in the government. The property, or the funds arising from its administration, were to be devoted to the purposes specified in the decree, and the mode of practically realizing these purposes was to be thereafter determined by future legislation. The decree was intended to further the cause of the revolutionary faction promulgating same by raising funds, and also by destroying the resources of its enemies.

Possession was taken of the ranches and cattle of the plaintiff under and by virtue of this decree by said revolutionary government.

"On the 19th day of October, 1915, the United States recognized the government of Carranza as the de facto government of the republic of Mexico, and on August 31, 1917, as the de jure government of Mexico. Prior to October 15, 1915, Gen. Francisco Villa refused longer to recognize the authority of Gen. Carranza, and revolted against him. The Villa revolt, from a military standpoint, assumed considerable proportions. His forces overran the state of Chihuahua, and drove the Carranza forces therefrom, and from the —— day of —— to about the —— day of —— he had complete control over the state of Chihuahua and other portions of the republic, and the state was governed by regulations issued by him as a military chief. His forces took possession of the Terrazas ranches in Chihuahua, and the cattle thereon, and he claimed his government had succeeded to the title acquired by the government represented by the Carranza forces.

"In October, 1915, one Gen. Chao, a Villa commander, had been in charge of what was known as the Sauz ranch, one of the Terrazas ranches. Defendant Holmes went to this ranch, and by purchase from the men in charge thereof acquired the possession of the cattle in controversy herein. The cattle were brought by said Holmes to the United States, and entered the United States in the neighborhood of El Paso, Tex. Upon their entry, or shortly thereafter, they were seized under the writ of sequestration issued in this case, and thereafter same were replevied by defendant. The cattle, at the time of their seizure by the sheriff, and at all times prior thereto, were the property of Gen. Luis Terrazas, unless his title had been divested by the decree of confiscation and the taking possession thereof by the said military forces. The cattle were taken from the possession of Holmes by the sheriff under said writ. The aggregate value of the cattle at the time of the trial was $——.

"There was a vigorous and bloody conflict between the forces of Carranza and Villa for the control of northern Mexico, in which the Carranza forces were ultimately victorious, and Villa lost control of the state of Chihuahua. The Villa movement accordingly lost force and character, and as a political factor Villa was eliminated. From that time down to the present time he has maintained a guerrilla warfare, but his operations have not been militarily or politically important.

"Conclusions of Law.

"The chief of a revolutionary movement, which, by military forces, acquired a fixed control over a large section of country, with the purpose of overthrowing the existing government and establishing another, has governmental control over the territory. The orders and decrees of such a military chief, while in control of the territory, are the law of the territory so controlled. The lives and property of the inhabitants of such territory are under the protection and control of such revolutionary government. If it seizes personal property in the territory so controlled for governmental

purposes, the seizure divests the owner of the property of his title. In civil war, either of the contending factions has the power and the legal right to seize, as enemies' property, personal property within a zone over which it acquires military control. This right is incident to the power to make war, and includes the power to carry it on by all lawful means, and the confiscation of an enemy's property is a well-recognized mode of warfare. The personal attitude of the owner of the property toward the confiscating authority is in no way determinative of the status of property in this respect. The determinative element is, might it in some way be of use to the enemy, or is it necessary to maintain the confiscating belligerent, or does it in some way harm the enemy? The confiscation decree and seizure of the cattle by the Carranza government completely divested plaintiff's title to the cattle. When Villa acquired military control over the state of Chihuahua, he succeeded to the property of the government which he overthrew, and this property his government might lawfully use. The act of de facto foreign government, now the de jure government of Mexico, was the act that divested plaintiff's title to the cattle in controversy in this suit. The Villa government lawfully succeeded to that title. An American court has not the power to question the acts of a de facto government of a foreign country, where those acts take place in such foreign country.

"It devolves upon plaintiff, in a suit to recover the title and possession of personal property, to show present title and present right of possession to the property. He cannot recover, even though the defendant have no title to the property, unless he show title in himself. The defendant can show any fact that disproves the facts vital to plaintiff's case, save where he directly or indirectly claims under an unlawful invasion of plaintiff's possession, in which case he cannot show title to be in another, with which he does not connect himself. Plaintiff's title was extinguished by the decree and seizure. Subsequent thereto, defendants showed a possession of the cattle acquired by purchase from parties in Mexico in possession of same. Defendants' possession of the cattle, in the absence of some showing of title in plaintiff, was sufficient to make out a prima facie case of title in the defendants. The judgment is in favor of the defendants."

These findings of fact and conclusions of law are approved; and since appellant has predicated his assignments of error upon the conclusions of law copied above, and asserts in many instances that such findings are not supported by the facts, we add the following additional findings of fact:

The parties agreed:

"That the cattle sued for by the plaintiff were owned by him prior to December 12, 1913, the date of the decree signed by Gen. Francisco Villa, hereinafter referred to [copied above], and were the property of plaintiff when the defendant Holmes received possession of them in the republic of Mexico, October, 1915, unless the title of said Terrazas passed to the revolutionary government of which Venustiano

Carranza was the head by virtue of said decree."

It is in testimony, and uncontradicted, that early in the year 1914 Gen. Carranza officially approved this decree.

Again it was agreed that "George Holmes purchased the cattle in controversy for a valuable consideration and acquired possession of them in the state of Chihuahua, Mexico, about October, 1915, from persons other than Terrazas, claiming to own the same."

Under several assignments, certain of the court's conclusions of law are attacked upon the ground that there is no evidence to support them. As to these the evidence which we find support such conclusions will be quoted in the proper place in discussing such assignments and propositions.

[1] Assignments 1 to 5, inclusive, attack the finding by the court that "the purpose of the decree was to divest the title of the persons named in the decree to the properties therein specified, and to vest title in the Mexican government," for the reason, it is urged, "that the instrument itself provides that other proceedings should be had before the title would otherwise pass." The decree does not in fact pretend to vest the title to the properties of the persons named in "the Mexican government," but "are confiscated for the public good," nor does the court so conclude or find, but finds as a fact that the purpose of the decree was to divest title from the persons named and vest it in the government. At the time this decree was promulgated, Huerta, by proclamation was the head of the civil or constitutional government of Mexico, and Carranza and Villa were at the head of the revolutionary army, and there is nothing to indicate that they were attempting to in any way direct, manage, or run any other than a revolutionary or military government within the territory controlled by them; and the agreed stipulation is that—

"The title to the cattle was in Terrazas when defendant Holmes got possession of them unless the title of the said Terrazas passed to the revolutionary government, of which V. Carranza was the head, by virtue of said decree."

And the court evidently intended to find in line with this stipulation. So, reverting to the proposition that the instrument itself provides that other proceedings should be had before the title would vest, it seems clear that the only question with which we are concerned is: Did this decree divest title out of Terrazas, and pass it to the revolutionary government, without the necessity of anything else being done? The answer is that from the whole of the instrument it clearly appears that by the language "they are confiscable and are confiscated for the public good," considered with the last paragraph of the decree, "all the confiscated properties shall be administered by the state bank," it was the intention to divest the Terrazas

title by this decree. And the part of it quoted, such as "a regulative law which shall be enacted at the triumph of our cause shall determine the relative and equitable distribution of the properties," in no way militates against the divestiture of title so far as plaintiff is concerned, but simply provides for its distribution "after the triumph of our cause." This is not the only thing we have to indicate what was meant by the decree. It was acted upon in a way to clearly indicate that it was in fact a seizure of the properties described. The agents of Terrazas were compelled to abandon the premises, the care of the cattle, etc., and Gen. Chao, one of the Carranza officers, placed in charge, and the undisputed evidence shows that cattle were sold under the decree. Thus they placed their own construction upon the meaning of the decree as a whole.

And we can see no reason why the opinion of the Mexican lawyer, as to the meaning of the decree as a whole, should in any way counteract the facts noted in construing the instrument, for, it being admitted that the translation in the record is a true one, we are in a proper position to construe it without any opinion from others. It is doubtful whether an opinion from experts in law is admissible in evidence upon the question. If we had a case wherein Huerta, representing the civil or constitutional government, was attempted to or had attempted to confiscate property under the forms of law, then the opinion of lawyers as to what law applied would be admissible.

[2] The sixth asserts that the Hague treaty (36 Stat. 2307) applies, and that under it the confiscation of private property or land is prohibited. This does not apply to civil warfare.

The seventh, eighth, and ninth propositions are urged that, in case of revolution, the Constitution of Mexico is not suspended, and the power to pass law is vested in the legislative department; for that reason the decree was void; therefore the court erred in holding that the decree divested title.

[3, 4] As stated above, this was not an attempt to pass a law, but simply a declaration by the heads of the revolutionary government that the properties of the persons named were taken for the purposes, and for the reasons designated in the writing, and there is no question of forfeiture under the forms of civil law involved. So the propositions of appellant that "the decree was void under the Constitution" and that "it [the Constitution] had not been suspended," and that "the act was not the act of a foreign government, but the act of a person without authority, have no application here, unless there is no evidence to support the findings by the trial court that Carranza and Villa were at the head, as commanding generals, of a revolutionary government, that they promulgated

the decree and took possession of the appellant's cattle pursuant to such decree, and there is no doubt that the evidence supports these findings. The cases Henry A. Oetjen v. Central Leather Co., 246 U. S. 297, 38 Sup. Ct. 309, 62 L. Ed. 726, and Eduardo Ricaud et al. v. Am. Metals Co., 246 U. S. 304, 38 Sup. Ct. 312, 62 L. Ed. 733, and the cases therein cited, declare the law to be that the seizure and sale of property in Mexico by a duly commissioned commander in the progress of a revolution, and when conducting active independent operations, is not subject to re-examination or modification by a court of the United States in an action of replevin involving title to such property," and that "when it has been made to appear that the foreign government has acted in a given way on the subject-matter of the litigation the merit of the result can not be questioned," and that the recognition by the government of the United States of the Carranza government in Mexico in October, 1915, is retroactive in effect and validates all the actions of such government. So, since we hold that the evidence supports the finding that Carranza approved the decree, thus making it his own, and that the property sued for was thereafter taken into possession by his forces, it follows that such acts were validated by the act of recognizing the Carranza government.

By other assignments and propositions it is urged that the court erred in its findings to the effect that Villa's forces overran the state of Chihuahua and drove the Carranza forces out, and that he (Villa) succeeded to the title, etc. These were immaterial findings, because, if we are correct in the holding that the title was divested out of plaintiff by the act of Carranza, then the stipulation between the parties is met.

[5] Assignments 23 and 24 assert the proposition that appellee cannot defend upon the ground that title was in a third person without connecting himself with such outstanding title. If appellant had pleaded and proved ownership or actual possession, and as to the latter proved that his (appellant's) possession had been invaded lawfully or unlawfully by appellee, then the latter could not defend by asserting an outstanding title in another. But in this case plaintiff has pleaded as a basis of his right to recover ownership and right to possession, and before he can recover he must prove one or the other, and he has proven neither. In such a case the defendant could rely upon a general denial, and when plaintiff failed to prove a right to recover defendant need not have attempted to prove title in another, to recover judgment that the plaintiff take nothing by his suit. Peaceable possession was sufficient. Grooms v. Rust, 27 Tex. 231; M. P. Ry. Co. v. Cullers, 81 Tex. 382, 17 S. W. 19, 13 L. R. A. 542.

There are many other assignments and propositions not specifically mentioned, but

we think are ruled by the above holdings, and are overruled.

Finding no reversible error, the assignments are overruled, and cause affirmed.