## TERRAZAS v. DONOHUE et al. (No. 1130.)

(Court of Civil Appeals of Texas. El Paso. Dec. 16, 1920. Rehearing Denied. Jan. 20, 1921.)

**1. Evidence ☜26—Judicial notice taken of date of recognition of foreign government.**

The Court of Civil Appeals will take judicial notice of the fact that the government of the United States recognized the government of Carranza as the de facto government of the republic of Mexico on October 19, 1915, and as the de jure government on August 31, 1917.

**2. Forfeitures ☜5—No forfeiture of property in times of peace unless judicially determined.**

In times of peace there can be no forfeiture of property unless the forfeiture be judicially determined.

**3. War ☜31—Civil and international wars supersede civil constitution and laws.**

In cases of civil as well as international wars, the laws of war supersede the civil constitution and laws, even where there is a written constitution applying in time of peace.

**4. International law ☜10—Court of Civil Appeals may not inquire into validity of confiscatory acts of Mexican military government.**

As affecting the title to cattle confiscated by the military government of Mexico, the Court of Civil Appeals may inquire only into the acts of the military government to determine whether it acted in a given way on the subject-matter, and may not inquire into the validity of its acts.

**5. Treaties ☜7—Hague conventions international, and do not apply to civil war.**

The Hague conventions are international in character and design, adapted to regulate international warfare, and do not in terms or in purpose apply to a civil war.

**6. International law ☜10—Validity of acts of chief of Mexican constitutional army as to confiscated property cannot be questioned.**

Title to cattle in Mexico passed from the owner to the constitutional army, of which Gen. Villa was first chief and military governor, under a confiscatory decree, and the validity of Gen. Villa's acts in dealing with the property cannot be inquired into in the courts of the United States on any ground whatever.

Appeal from District Court, El Paso County; P. R. Price, Judge.

Suit by Luis Terrazas against T. J. Donohue and others. From judgment for defendants, plaintiff appeals. Affirmed.

Davis, Goggin & Loftus, of El Paso, for appellant.

F. G. Morris, of El Paso, for appellees.

WALTHALL, J. This is a companion case to Luis Terrazas v. Holmes et al., 225 S. W. 848, decided by this court at its present term.

Appellee Donohue having in his possession 325 head of cattle claimed by appellant, Terrazas, in order to have appellant forego steps to sequester said cattle, gave a bond with the other appellees as sureties, conditioned that he would pay any judgment that appellant might recover decreeing the title to said cattle to be in appellant. Wherefore appellant brought this suit to recover on said bond the value of said cattle. Upon trial before the court without a jury judgment was rendered in favor of appellees. From that judgment

appellant perfected his appeal to this court. It was admitted:

"That the cattle involved in this suit were, prior to the decree of confiscation, Terrazas' cattle, or the increase of Terrazas' cattle."

The trial court made findings of fact which we need not state in full, as much of it is included in the above admission. The trial court's findings include the following:

Terrazas owned the cattle on the ranches on which they were raised on and prior to the 12th day of December, 1913, and on and prior to the 1st day of December, 1913, had control and possession of his cattle and his ranches. On the 1st day of December, 1913, Terrazas crossed into the United States with the foreman of his ranches in flight from the excesses of Francisco Villa. The value of the cattle at El Paso, Tex., at the time of the institution of the suit and giving the bond herein was $8,325 at Juarez, Mexico. A Mexican peso at that time was equal to 50 cents American money. Terrazas has never voluntarily parted with the title or possession of the cattle. When the bond herein was given by defendants, the cattle were in the stockyards in El Paso, Tex. At the time Terrazas came to the United States a condition of war existed in Mexico, wherein Carranza and others had organized and brought about a revolution against what was known as the Huerta government. Through this revolution, inaugurated under a declaration of principles and policies known as the Plan of Guadalupe, Francisco Villa became military governor of the state of Chihuahua, and was otherwise designated first chief of the constitutional army of the state of Chihuahua; that at the time of the decree of December 12th herein the constitutionalists were in military control of the state of Chihuahua, and while in control Francisco Villa issued the following decree. The decree, translated from the Mexican language, in which it was written, into the English language, and adopted by the trial court as a proper translation, bears date December 21, 1913, and reads as follows:

"Decree Relative to the Confiscation of Property.

"Gen. Francisco Villa, first chief of the constitutionalist army in the state of Chihuahua, and in conformity with the Plan of Guadalupe, provisional governor of said state, in accordance with the extraordinary powers with which I am invested, I have seen fit to decree the following:

"Having sufficient proofs as to the intervention that various capitalists of the state have had in the latest difficulties that our country has had to solve, causing, by the natural defense against exploitations, coup d'état (cuartelazos), and treasons, numerous victims comprising orphans and widows who now bemoan the disappearance of those who were the support of these innocent beings, whose only fault has been the enviable patriotism with which they sustained the dignity of our country, and there also being among those wrongfully enriched some who have defrauded, by a thousand means, the public treasury during more than half a century of domination, through deceit and force, I believe that in justice the hour has arrived for them to render account to public vengeance, through the institution and prosecution of criminal investigations at the proper time, before the proper authorities, for the purpose of elucidating all the responsibilities incurred with respect to the Mexican people. And as it already has, on previous occasions, been fully proved that the possession of their wealth has only served them to buy traitors and to assassinate officials whose excessive kindness served as an incentive to their evil deeds, it is necessary, in order to save our nationality, to cut out the evil at the root, having to carry out, besides other measures of public welfare, accordingly as they become necessary, the confiscation of property belonging to the bad Mexicans who have commercialized human life and who are the immediate causers of the shedding of our blood.

"For such reasons, which justify our attitude before the dignity of the whole world, I decree the following:

"First. Confiscable and confiscated are, for the public welfare and for the purpose of guaranteeing pensions to widows and orphans caused by the defense that the Mexican people have made against the exploiters of the administration, and also to cover the liabilities which, as a result of their doings, shall be determined in the judgments rendered and which shall be made known at the proper time by the special courts, which, for the purpose of restitution of ill-gotten property, shall be established in suitable regions fixing the amount of those liabilities and applying them in their entirety to those ends, the personal property, real estate and documents of all kinds belonging to the parties Terrazas (Luis) and sons, Creel brothers, Falomir brothers, Jose Maria Sanchez, Cuilty brothers, Lujan brothers, J. Francisco Molinar and all their kin, and other accomplices who may have been mixed with them in the dirty transactions, and in the fraudulent combinations which were called political in other times.

"Second. A regulative law, which shall be enacted upon the triumph of our cause, will determine the matters relative to the equitable distribution of those properties, first pensioning widows and orphans whose relatives may have defended the cause of justice since 1910; then shall be considered the defenders of our cause for the distribution of those lands at a moderate price; reimbursement shall be made to the public treasury for the frauds committed by the said parties through failure of payment of taxes during the many years that such things occurred; and there also shall be restored to the original legitimate owners, the properties that were taken from them through use of their power by those parties, thereby doing full justice to the many victims of the usurpation.

"Third. All the confiscated properties shall be managed by the state bank, which shall keep detailed account, correctly vouched, of receipts and disbursements which may occur in such management.

"Given at the government palace this 12th day of December, 1913. Gen. Francisco Villa, Military Governor of the State. S. Terrazas, Secretary."

The trial court further finds:

"It does not appear that any action was ever taken under said decree by the State Bank, mentioned in the third paragraph thereof.

"That the defendants received possession from one Salvador Zamora, who acted as the local agent at Juarez of intervened confiscated properties, and that Zamora delivered to plaintiff's vendor, Paul Lisso, a receipted bill for the cattle herein. All at Juarez, Chihuahua, Mexico.

"That Lisso sold the cattle herein to defendant Donohue and delivered possession thereof to Donohue.

"That defendant Donohue was in possession of the cattle at the time of the bond and suit herein.

"That the word 'intervenidos' in the Spanish language is not interchangeable with the word 'confiscados'; that the word 'intervenidos,' as used in the Mexican law and terms, supposes that some action, report or administration will be had upon the property 'intervenido.'

"That in the actions of the Mexican government subsequent to the decree herein the properties of Luis Terrazas were construed as being 'intervenidos.' "

[1] This court will take judicial notice of the fact that the government of the United States recognized the government of Carranza as the de facto government of the republic of Mexico on October 19, 1915, and as the de jure government on August 31, 1917.

The trial court concluded, as matter of law, that Francisco Villa, as the military commander of the state of Chihuahua, had the power to divest, and the decree did divest, the plaintiff of the title to the cattle in that state; that by reason of said decree and the subsequent recognition of the Mexican government by the United States, plaintiff did not establish in this suit a right to the title or possession of the cattle in this suit. The court rendered judgment for appellee, and appellant has perfected his appeal from that judgment.

The trial court having found, and it was admitted, that Terrazas would be entitled to the cattle involved in this suit but for the acts of the military authorities in Mexico, the first five assignments, on different grounds, contend that the decree above set out did not have the effect to divest plaintiff of the title of the cattle; appellant insisting that, since the instrument itself provides that other proceedings should be had before the title would otherwise vest, the court could not properly hold that the decree was self-acting in divesting Terrazas of the cattle.

This proposition is based largely upon the testimony of Judge Gandara, a prominent Mexican lawyer of the state of Chihuahua, in which he said that—

"A regulative law is a secondary law that is used, or is passed, to show how the original or main law shall be made operative. There has been no regulative law enacted under that decree."

Jesus J. Falomir, one of Falomir brothers mentioned in the decree, testified that he had never heard of any action being taken by the courts of Mexico, or by the State Bank of Mexico, under the provisions of this decree towards the enforcement of those provisions. We assume, from the uncontradicted evidence, that there has been no law enacted in Mexico under the decree having for its purpose the enforcement of the provisions of the decree of confiscation. The questions arise: Is the decree of confiscation self-acting? Does it express a present confiscation of the title and right of possession of the cattle in the military or constitutional government of Mexico, of which Gen. Francisco Villa was the first chief and military governor, in the state of Chihuahua? Was a regulative law, or any other law, necessary to make the decree effective in divesting the title and right of possession of the cattle out of Terrazas? If we look to the action of the military authorities, acting under the decree for an official contemporaneous construction of the decree, as intending to divest title in præsenti, we find that the cattle were seized and sold by the military without judicial action. The argument recited in the preamble of the decree, we think, warrants the construction that the injuries apprehended to arise from permitting the owners of the cattle to remain in possession demanded immediate action, a preventive measure, "necessary to save our nation, to uproot the evil." It declares the property confiscable and confiscated. The confiscation of the cattle, it seems to us, was intended to be a separate matter from that proposed to be reached by a regulative law and judicial proceeding later to be inaugurated, except possibly as to the proceeds of the property confiscated. The decree evidently contemplated that the regulative law thereafter to be put into operation would have to do with the proceeds or distribution of the properties rather than as an aid to the confiscatory decree, or as a part of the decree itself. But the argument of appellant seems to be that, whatever construction may be put upon the decree as to the time when the forfeiture of title and right of possession of the owner to the cattle took place, it is by the judgment alone under the regulative law proposed in the decree that the title to the owner could be separated from his property; that the proceeding in the court was necessary to give the owner an opportunity of a legal investigation.

[2] To sustain that view we are referred to several cases. There can be no doubt but that the books and cases we have examined

well sustain the proposition that at common law and in times of peace there can be no forfeiture of property unless the forfeiture be judicially determined. A statute or ordinance which allows the seizure and confiscation of a person's property by ministerial officers without inquiry before a court or an opportunity of being heard in his own defense is a violation of the elementary principles of law, and, if done in this country, would be in violation of the Constitution of this country. But these principles apply in times of peace where the different branches of government are functioning, when statutes and Constitutions are observed, and the opinions of the courts rest upon the wording of the law, and when, in the eternal struggle that exists between avarice, enterprise, and combination of individuals, on the one hand, and the power charged with the administration of law, on the other, the executive seeks to carry into effect the measures of policy as found in legislative enactment or in constitutional provision. But the circumstances here took place in a country foreign to this, and at a time of revolution, when the people making the decree under consideration, as expressed in the decree, seemed to think that a confiscation by the military of the enemy's property should then take place. The decree recites facts, as grounds for immediate action, which are not put in issue here. The decree here was distinctively a civil war measure.

[3] We understand from the cases we have examined that in cases of civil, as well as international, wars, the laws of war supersede the civil constitution and laws, even where there is a written constitution applying in time of peace. Without reviewing at length the cases we have examined, we think the above observation is sustained by the following cases: New Orleans v. New York Mail Steamship Co., 20 Wall. 387, 22 L. Ed. 358; Kirk v. Lynd, 106 U. S. 315, 1 Sup. Ct. 296, 27 L. Ed. 193; Lamar v. Browne, 92 U. S. 187, 23 L. Ed. 650; Coolidge v. Guthrie, 6 Fed. Cas. p. 461, No. 3185. But aside from that, and upon which we prefer to decide the issues here presented as held by this court in Terrazas v. Holmes Case, at the present session, the opinion not yet published, we believe the following cases of Henry A. Oetjen v. Central Leather Co., 246 U. S. 297, 38 Sup. Ct. 309, 62 L. Ed. 726, and Edwardo Ricaud et al. v. American Metal Co., Limited, 246 U. S. 304, 38 Sup. Ct. 312, 62 L. Ed. 733, and the cases therein cited are conclusive of the issues presented in this case. We invite a careful reading of the above cases. In those cases it was held, substantially, that the conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative "the political" departments of the government, and the propriety of what may be done in the exercise of this political power is not subject

227 S.W.—14

to judicial inquiry or decision. Mr. Justice Clarke, in so holding, refers to a long list of cases, among them United States v. Palmer, 3 Wheat. 610, 4 L. Ed. 471, Foster v. Neilson, 2 Pet. 253, 307, 309, 7 L. Ed. 415, 433, and others. In Oetjen v. Central Leather Co., supra, Mr. Justice Clarke, speaking for the court, says:

"It is also the result of the interpretation by this court of the principals of international law that when a government which originates in revolution or revolt is recognized by the political department of our government as the de jure government of the country in which it is established, such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence."

The court then adds a well-recognized principle:

"Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

See Underhill v. Hernandez, 168 U. S. 250, 252, 18 Sup. Ct. 83, 42 L. Ed. 456, 457, and other cases cited.

In this case, as in the Oetjen v. Central Leather Co. Case, and arising under similar facts in the same country, we have a duly commissioned military commander of what must be accepted as the legitimate government of Mexico, in the progress of a revolution, and when conducting active independent operations, confiscating, seizing, and selling in Mexico, as a military contribution, the property in controversy, at the time owned and in the possession of a citizen of Mexico.

[4] As said by the Supreme Court in the Oetjen v. Central Leather Co. Case,

"Plainly this was the action, in Mexico, of the legitimate Mexican government when dealing with a Mexican citizen, and, as we have seen, for the soundest reasons, and upon repeated decisions of this court, such action is not subject to re-examination by the courts of this country."

The finding of the trial court shows conclusively that the title and possession of the cattle came to Donohue through Zamora, who was then acting as the local agent at Juarez, Mexico, of the confiscated properties. It cannot be denied that the title and possession of the cattle in Donohue was the direct result of the confiscation, seizure, and sale of the Terrazas cattle to Donohue by the military authorities of the Mexican constitutional army, of which Gen. Villa was the first chief and military governor in the state in which the seizure and sale took place. We may inquire only into the acts of the military gov-

ernment of Mexico to determine whether the military government has acted in a given way on the subject-matter of litigation. We may not inquire into the validity of those acts. As was said by the court in the Oetjen v. Central Leather Co. Case:

"To permit the validity of the acts of one sovereign state to be re-examined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.' "

What has been said above applies also to assignments from the sixth to the thirteenth, inclusive, in which it is asserted that laws must be enacted to express the will of the sovereign power to confiscate property, and under the constitution of the republic of Mexico the power to pass laws is vested only in the legislative department of the government; that the holding of the trial court under the facts found is contrary to international law, the laws of war, and provisions of the Hague Treaty; that the confiscating decree should be strictly construed with a view to the principle that forfeitures are discountenanced by the law; that the courts of this country have the right to pass upon the authority of persons to act in a foreign country, so far as such acts purport to change the title to properties afterwards found within the jurisdiction of the court; that the promulgation of the decree was not the act of a foreign government, but the act of a person without jurisdiction and authority to make such decree; that the acts of Villa, being the unauthorized acts of an official or agent of a government, are not the acts of a government; that appellee failed to satisfy the burden of proof setting up a decree of confiscation to show that it was valid and vested title.

[5] The Hague Conventions are international in character, designed and adapted to regulate international warfare, and do not, in terms or in purpose, apply to a civil war.

It is possible that, had the acts of confiscation, seizure and sale of the cattle taken place here, and not in Mexico, in a state of revolution, the proposition might have force. But if the validity of the confiscation seizure, and sale of the property may not be inquired into in the courts of another sovereign power, as held in the quotation above, it seems immaterial to this investigation whether laws were enacted to express the will of the military power to confiscate, seize, and sell the property. The act was a military measure by the revolution of the Mexican people, the revolting party then being in power.

As said in Miller, Ex'r, v. United States, 11 Wall. 268, 20 L. Ed. 135, the whole doctrine of confiscation is built upon the foundation that it is an instrument of coercion; hence any property which the enemy can use is a proper subject of confiscation. The decree asserts that Terrazas was an enemy to the revolution, and that the property had been used against the revolution. We have reached the conclusion, from the authorities examined and some of them referred to in what has been said in discussing the first five assignments, that there is no limit to the war power of the supreme military authority of an organization of war with another organization; that no neutral country can sit in judgment on the validity of the supreme sovereign power in a given territory, and hold its acts void because it violates the laws of its own government. In discussing the case of New Orleans v. N. Y. Mail S. S. Co., 20 Wall. 387, 22 L. Ed. 358, the United States Supreme Court said the conquering power has a right to displace the pre-existing authority and to assume, to such extent as it may deem proper, the exercise by itself of all the powers and functions of government; it may do anything necessary to strengthen itself and weaken the enemy. "In such cases the laws of war take the place of the Constitution and laws of the United States as applied in times of peace." There can be no doubt but that Gen. Villa took possession of the cattle with intent to appropriate them as an act of the military, and as an act of war.

[6] Under the authorities we have read and from which we have quoted, the title to the cattle passed from the owner to the constitutional army, of which he was first chief and military governor, and the validity of his acts in dealing with the property cannot be inquired into in the courts of this country on any ground whatever.

Under assignments 14, 15, and 16, the proposition is made that defendants cannot show title in a third person so as to defeat plaintiff's right, without connecting themselves with such outstanding title.

If the title to the cattle passed from Terrazas to the constitutionalist army by reason of the act of confiscation, or by reason of the act of seizure of the cattle by Gen. Villa, appellant would have no title to assert against appellees unless by some means his former title reinvests in him, or by some subsequent act he again becomes the owner. Evidently the plaintiff's title to the cattle was not merely suspended while he was out of possession and reinvested in him by reason of the giving of the bond by appellees. The facts found by the court show that appellees became the owners of whatever title the military authority of the revolutionary party had.

Finding no reversible error, the judgment is affirmed.