## UNITED STATES v. BANK OF NEW YORK & TRUST CO.

### No. 304.

Circuit Court of Appeals, Second Circuit.

May 20, 1935.

See, also, 77 F.(2d) 881.

Martin Conboy, U. S. Atty., and Francis H. Horan and Edward J. Ennis, Asst. U. S. Attys., all of New York City.

Emmet, Marvin & Martin, of New York City (Frederick B. Campbell, Paul C. Whipp, and Lounsbury D. Bates, all of New York City, of counsel), for defendant-appellee Bank of New York & Trust Co.

Cabell, Ignatius, Lown & Blinken, of New York City (Hartwell Cabell, of New York City, of counsel), for intervener.

Samson Selig, of New York City (Samson Selig and George D. Bradford, both of New York City, of counsel), amicus curiæ.

Engelhard, Pollak, Pitcher, Stern & Clarke, of New York City (Walter H. Pollak and Murray I. Gurfein, both of New York City, of counsel), for judgment creditors of Moscow Fire Ins. Co.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This is an action in equity for an accounting. The suit was commenced August 22, 1934. It is alleged in the bill that the Moscow Fire Insurance Company of Moscow, Russia, was a corporation organized under the laws of the state of Russia to engage in the business of fire insurance, and that, until dissolved, it was duly authorized in accordance with the laws of the state of New York to do business in that state; that in ·compliance with the New York law it had deposited with the New York Superintendent of Insurance certain cash, securities, and "other items of value" as a fund out of which the claims of the domestic creditors of the corporation should be paid and that it had done business in New York; that in 1917 and 1918 it was dissolved by decrees of the Russian State "and all of its right, title and interest and all the right, title and interest of all of its stockholders in its property, including the deposits hereinbefore mentioned with the Superintendent of Insurance of the State of New York, were confiscated and appropriated by the said Russian State"; that by April 18, 1933, all the claims of domestic creditors to the fund so deposited had been satisfied, and the New York Superintendent of Insurance had, pursuant to an order of the Supreme

MANTON, Circuit Judge, dissenting.

———◆———

Court of New York, New York County, deposited with the defendant, as the agent or depository of the said Moscow Fire Insurance Company, the remainder of said fund consisting of cash and securities of the value of $1,080,399.54 upon the condition that it was not to be withdrawn except upon the order of a court of competent jurisdiction; that the defendant had possession of the fund so deposited or of the avails thereof. It was further alleged that on or about November 16, 1933, the Russian State assigned all of its right, title, and interest in the deposit to the plaintiff, who is the sole owner entitled to immediate possession and who had demanded the fund of the defendant; that the demand had been refused and that the fund was being wrongfully withheld from the plaintiff by the defendant. It was further alleged that the defendant held the fund as trustee for the plaintiff who had no adequate remedy at law. An injunction to keep the fund in the possession of the defendant pendente lite was a part of the relief sought.

The defendant did not answer, but moved to dismiss on the ground that the bill stated no cause of action. The plaintiff's motion for an injunction was denied and the defendant's motion to dismiss granted.

Although the appellee has argued at length that the assignment did not convey to the plaintiff any title to or interest in the fund for the reason that (1) the assignor had no title or interest not based upon confiscation which is a concept so repugnant to our public policy that we will not recognize and enforce it, and (2) that the assignment in terms did not cover the fund, we think the order must be affirmed regardless of whether there is any merit in the argument on these two points. For present purposes we will assume the assignment to be sufficient to transfer to the plaintiff whatever right to an accounting by the defendant the Russian State, the assignor had. See State of Russia v. Nat. City Bank (C. C. A.) 69 F.(2d) 44.

■ We take judicial notice of the recognition of the Soviet Government by the United States on November 16, 1933, which was the day on which the assignment here relied upon was made. Underhill v. Hernandez, 168 U. S. 250, 18 S. Ct. 83, 42 L. Ed. 456. By that act of recognition the decrees under which this Russian corporation was dissolved and its property confiscated by the Soviet Government became as valid as they would have been had they been passed at a time when we had already recognized the Soviet Government. The effect of recognition was to that extent retroactive. Ricaud v. American Metal Co., 246 U. S. 304, 38 S. Ct. 312, 62 L. Ed. 733; Oetjen v. Central Leather Co., 246 U. S. 297, 38 S. Ct. 309, 62 L. Ed. 726. When our government recognized that government, the public policy of this country to recognize the validity of Soviet decrees within Soviet territory was established. No one will question the power of the government of the domicile of a corporation to destroy what it has created. Bank of Augusta v. Earle, 13 Pet. 519, 587, 10 L. Ed. 274; Head v. Providence Ins. Co., 2 Cranch, 127, 168, 2 L. Ed. 229. When the now recognized Soviet Government issued its decrees to that effect this corporation was dead. Oklahoma Natural Gas Co. v. State of Oklahoma, 273 U. S. 257, 47 S. Ct. 391, 71 L. Ed. 634; The Greyhound, 68 F.(2d) 832 (C. C. A. 2). There can be no serious dispute that its property and all its corporate rights in Russia were subject to such disposition as actually took place in accordance with Russian law. The Russian State obviously could, and this record shows that it did, confiscate everything belonging to this corporation within the confines of Russia. It could, and did, acquire for itself every right the corporation in Russia possessed. It became the corporation there so far as we are now concerned. It had all its property and rights as fully as though the corporation had lawfully assigned them to it before dissolution. To that extent our public policy as to confiscatory decrees, so far as it may be expressed by our courts, is of no moment. When the executive branch recognized the Soviet Government, the judicial branch became bound to recognize the validity of Soviet decrees in Soviet territory from the beginning of the Soviet régime. Oetjen v. Central Leather Co., supra. See, also, Lazard Bros. & Co. v. Midland Bank, Ltd., [1933] A. C. 289, H. of L., for the rule in England. Consequently we must for present purposes take the Soviet Government to have become to all intents and purposes the Russian insurance corporation in Russia which owned the deposit in New York subject to the fulfillment of the conditions upon which the deposit was made with the New York Superintendent of Insurance.

■ For present purposes, also, we may assume arguendo that the present plaintiff has by assignment acquired all the rights in and

to the deposit which the Soviet Government took in Russia from the corporation which made the deposit. That is the best position the plaintiff can claim, and in view of the disposition which in our opinion now must be made of this appeal we think it would be inadvisable, as it is unnecessary, to express our opinion on the merits as to this point. It is enough that we assume without deciding that the plaintiff has all the rights which the depositing corporation would, if now in existence, possess. The transfer of those rights to the plaintiff did not enlarge them because the assignee happened to be the United States. The United States has no greater rights than those of an assignor. United States v. Buford, 3 Pet. 12, 30, 7 L. Ed. 585; Ritter v. United States (C. C. A.) 28 F.(2d) 265. Though sovereign powers have been dealing with each other, they have been dealing in private causes of action and the plaintiff is simply attempting to enforce, as assignee, the claim of a Russian corporation to what remains of a deposit it made in this country.

As has already been stated, this remainder of the original fund has been placed on deposit with the defendant bank pursuant to an order of the New York court. It is now pertinent to state further that the record shows that this order of the New York court was made in the course of liquidation proceedings brought and prosecuted by the New York Superintendent of Insurance in accordance with the New York law in New York courts within whose jurisdiction the fund actually was. On August 11, 1931, the New York Supreme Court, acting in accordance with a decision of the New York Court of Appeals (see In re People, by Beha [In re Moscow Fire Insurance Co. of Moscow, Russia], 255 N. Y. 433, 175 N. E. 120), ordered the deposit now in controversy made in the defendant bank. Rather extensive liquidation proceedings have been conducted in the New York courts which it will now serve no good purpose to relate in detail. The important matter is that before this action was commenced the fund in controversy had been taken into the custody of the New York court and has ever since remained in its custody. The sole purpose of the proceeding in the New York court was to liquidate the fund and distribute it according to its laws. To that end, the state suit was in rem. During its prosecution the remainder of the fund, consisting of cash and securities left after domestic creditors had been paid, was actually deposited with this defendant under an order of the court which controlled within its own proper jurisdiction the proceedings and the fund in liquidation. That being so, this suit cannot be maintained to deprive the state court of its previously acquired jurisdiction of the res in its custody. Covell v. Heyman, 111 U. S. 176, 4 S. Ct. 355, 28 L. Ed. 390; Harkin v. Brundage, 276 U. S. 36, 48 S. Ct. 268, 72 L. Ed. 457; Lion Bonding & Surety Co. v. Karatz, 262 U. S. 77, 43 S. Ct. 480, 67 L. Ed. 871; Wabash R. Co. v. Adelbert College, 208 U. S. 38, 28 S. Ct. 182, 52 L. Ed. 379; Farmers' Loan & Trust Co. v. Lake St. Elevated R. Co., 177 U. S. 51, 20 S. Ct. 564, 44 L. Ed. 667. Though the federal courts have original jurisdiction of suits at law or in equity in which the United States is the plaintiff, such jurisdiction is not exclusive. People's Trust Co. v. United States (C. C. A.) 23 F.(2d) 381; Merryweather v. United States (C. C. A.) 12 F.(2d) 407. Were the proceeding in the New York court one for a personal judgment only, the result would be otherwise, for the rule is that a prior action in personam does not prevent the maintenance of an action for the same cause in another jurisdiction—at least until the matters in issue become res adjudicata. Kline v. Burke Const. Co., 260 U. S. 226, 43 S. Ct. 79, 67 L. Ed. 226, 24 A. L. R. 1077. Even then the effect is of a different nature, being what is attributable generally to such a plea and its proof. Nor is there any question here of the personal liability of the defendant apart from what may attach solely from the fact that a fund in the custody of the state court to which the plaintiff makes claim has been placed in its possession under the order of the state court. There being no such separate personal liability, there is no room for the application of the rule expressed in Waterman v. Canal-Louisiana Bank & Trust Co., 215 U. S. 33, 30 S. Ct. 10, 54 L. Ed. 80, that rights in personam within the federal equity jurisdiction will be determined and enforced when by so doing property in the custody of the state court is not seized and controlled. Compare Byers v. McAuley, 149 U. S. 608, 13 S. Ct. 906, 37 L. Ed. 867.

The real status of the plaintiff as only a claimant to the fund is at least emphasized by the fact appearing of record that it did on August 13, 1934, file proof of its claim in the state court action for the entire $1,080,-399.54 and interest. Its claim was based upon the facts relied upon in this suit

brought but nine days later. Apparently the claim was not pressed. Under the circumstances already related the jurisdiction of the New York court should be respected. Penn General Casualty Co. v. Pennsylvania ex rel. Schnader, 294 U. S. 189, 55 S. Ct. 386, 79 L. Ed. — (decided February 4, 1935). If the final decision is contrary to applicable federal law, it may be reviewed by the Supreme Court. Stanley v. Schwalby, 162 U. S. 255, 278, 16 S. Ct. 754, 40 L. Ed. 960; Spokane County v. United States, 279 U. S. 80, 49 S. Ct. 321, 73 L. Ed. 621; People's Trust Co. v. United States, supra; 28 USCA § 344 (b).

█ The motion for an injunction pendente lite had for its object a stay of proceedings in a state court which were within the jurisdiction of that court. No such injunction was authorized by any law relating to proceedings in bankruptcy, was not necessary to protect jurisdiction possessed by any federal court, and was properly denied. 28 USCA § 379.

Decree affirmed.

MANTON, Circuit Judge, dissents with opinion.

MANTON, Circuit Judge (dissenting).

The complaints in these actions ask for accountings seeking to recover balances held by Russian insurance corporations, Moscow Fire Insurance Company of Moscow, Russia, the First Russian Insurance Company, and Northern Insurance Company of Moscow, Russia, held by the respective banks, appellees, as depositories. Each insurance company had its principal offices in Russia.

In Bank of New York & Trust Company Case, the complaint alleges that in 1917 and 1920 decrees of the Russian State dissolved the Moscow Fire Insurance Company; that all of its right, title, and interest and all the right, title, and interest of the stockholders in its property, including deposits made with the Superintendent of Insurance of the State of New York, were confiscated and appropriated by the Russian State. It alleges that, on April 18, 1933, the claims of domestic creditors to the fund deposited with the Superintendent of Insurance of New York had been satisfied, and that he, pursuant to an order of the Supreme Court of New York, directed that the fund be released and paid, and the balance transferred and delivered to the agent or depository of the Moscow Insurance Company, not to be withdrawn except upon an order of a court of competent jurisdiction; that the appellee received and had cash securities amounting to $1,180,399.54. It set forth an assignment on November 16, 1933, by the Russian State to the appellant, for valuable consideration, of all the right, title, and interest in and to the cash and securities constituting the balance of the deposit, and also that the appellant by assignment had all the right, title, and interest of all Russian nationals in and to this cash and securities, and that it was the sole and exclusive owner entitled to immediate possession. It alleges a demand of and refusal by appellee to deliver this property to appellant and the wrongful withholding thereof.

In the Van Schaick Case, 77 F.(2d) 880, the complaint pleaded that the First Russian Insurance Company had been dissolved by decree of the Russian State and its property, including its deposit with the Superintendent of Insurance of New York, had been confiscated and appropriated by the Russian State. It alleges that on August 8, 1925, by order of the New York State Supreme Court, the Superintendent of Insurance took possession of the property of the domestic United States branch of that insurance company (established 1907) under section 63 of the Insurance Law of the State (Consol. Laws, c. 28); that all domestic claims had been adjudicated and allowed, leaving undisposed of certain foreign claims which arose in the conduct of the business outside of the United States; that two claimants residing in the city of New York had been allowed $128,010.58 and $38,403.17 each, respectively, by an order of the State Supreme Court on February 26, 1934; that on appeal to the Appellate Division of the Supreme Court of the state, this award was affirmed, In re People, by Beha, 242 App. Div. 616, 271 N. Y. S. 1075, Id., 242 App. Div. 615, 271 N. Y. S. 1076 (June 15, 1934), but that an appeal was taken to the Court of Appeals of the State of New York and is undisposed of. In re People, by Beha, 266 N. Y. 421, 195 N. E. 136. An assignment of the balance of $1,170,783.36, as of November 16, 1933, is pleaded.

In the case of President and Directors of the Manhattan Company, 77 F.(2d) 881, it is pleaded: That the Northern Insurance Company of Moscow is a Russian corporation with a branch in New York, and that it made a deposit with the Superintendent

of Insurance of New York to comply with the requirements of the Insurance Law. That it, too, had been dissolved back in 1917 and 1918, and its property confiscated by the Russian State. That the Superintendent of Insurance took possession August 3, 1933; the claims of domestic creditors as to this fund, deposited with the Superintendent of Insurance, were satisfied pursuant to an order of the State Supreme Court and directed that the funds be released, paid, and transferred to the agent or depository of the Northern Insurance Company of Moscow, said funds to be withdrawn upon order of a court of competent jurisdiction. The amount here involved was $332,994.15 held by the appellee. It is alleged that this, too, was assigned on November 16, 1933. Demands were made for the payment of these moneys pursuant to this assignment and refused.

In each case a restraining order against disposition pending the trial of a suit was denied and on motion supported by affidavits, each of the complaints was dismissed.

The United States claims title to these balances and asks for an accounting by virtue of two assignments executed by agents of the Russian government—the Ughet and Litvinov assignments, the first executed prior to and the second since recognition. The questions presented are: (1) Does the claim of the government to the balance named in the hands of the appellees come within the terms of the so-called Litvinov assignment; and (2) assuming it does, what is the effect of a political recognition of the Union of Soviet Socialist Republics, and should such recognition be retroactive and extraterritorial in its effect?

As to the first question: On the 16th of November, 1933, Litvinov, the People's Commissar for Foreign Affairs of the Soviet Union, executed in his official capacity an assignment which was a part of the general scheme of recognition of the Soviet Union by the terms of which it assigned to the government of the United States "the amounts admitted to be due or that may be found to be due it (the Soviet Government), as the successor of prior governments of Russia, or otherwise, from American nationals, including corporations, companies, partnerships, or associations * * *." Questions as to this assignment must be resolved according to the maxims and principles of the Law of Nations (Henfield's Case, 11 Fed. Cas. 1099, 1101, No. 6,360),

which requires that a formal engagement between two nations—whether such engagement be in the form of a treaty or of an executive agreement—should be construed as liberally and untechnically as the exigencies of the case may demand in order to effectually carry out the evident or probable design of the parties in executing it. Ware v. Hylton, 3 Dall. 199, 1 L. Ed. 568; The Amiable Isabella, 6 Wheat. 1, 71, 5 L. Ed. 191; United States v. De la Maza Arredondo, 6 Pet. 691, 8 L. Ed. 547; Geofroy v. Riggs, 133 U. S. 258, 267, 10 S. Ct. 295, 33 L. Ed. 642; Wright v. Henkel, 190 U. S. 40, 23 S. Ct. 781, 47 L. Ed. 948; Rocca v. Thompson, 223 U. S. 317, 32 S. Ct. 207, 56 L. Ed. 453. "Such solemn international instruments between independent sovereignties as public treaties, intended primarily for the common advancement of their individual interests, the interests of civilization, and the promotion of international amity, are not to be read as rigidly as documents between private persons governed by a system of technical law, but, so far as it can be done without the sacrifice of individual rights or those principles of personal liberty which lie at the foundation of our jurisprudence, should be construed in the light of that larger reason, that broader, fairer and more liberal sense calculated to perpetuate that international concord which constitutes the spirit of the law of nations." Puente, International Law, p. 228.

The ultimate design of the two countries in executing this assignment was to transfer "the claims and counterclaims between the Governments of the Union of Soviet Socialist Republics and the United States of America, and the claims of their nationals," to the broad plane of diplomacy, and by placing those claims beyond the reach of vexatious judicial action, to facilitate at one stroke the adjustment of the delicate points at issue between the two countries. No narrow or strained construction of that instrument is permissible under these circumstances. The funds at issue are admitted to be the balances of the assets of Russian corporations with branch offices here affected by the Soviet decrees whose local business was liquidated by the courts of the state of New York. In re Moscow Fire Ins. Co., 255 N. Y. 433, 175 N. E. 120. If it be sound, as the appellant contends, that the effect of the Soviet decrees is to vest in the Soviet Government complete title to those funds, and to give that government a cause of action to recover

them, then, on that hypothesis, we would be bound to hold that the funds in the safe-keeping of appellee—an "American national"—are such as "may be found to be due" the Soviet Government within the terms of the assignment; that is, which "ought to be paid" by appellee, or which "may be demanded" by the assignor. 1 Bouv. Law Dict. (Rawle's 3d Rev.) 946; Ransom v. Bidwell, 89 Conn. 137, 93 A. 134. The fact that by the terms of the assignment the Soviet Government has renounced its right to sue American nationals who may be indebted to it is a circumstance strongly urging upon us the broadest possible interpretation of the terms of the assignment. If, however, the effect of the Soviet decree is not such as to vest title to the funds in the Soviet Government, then there would be no question that the funds would not fall within the terms of the assignment and the claims of the appellant must fail. Whether or not the funds here involved are included in the terms of the assignment depend upon the juristic effect of the political act of recognition, and on the degree of extraterritorial force which international comity—the comitas gentium—ordains that we should give to Soviet legislation of this character.

The conduct of the international relations of the nation is a matter of state (The Rogdai [D. C.] 278 F. 294) which the Constitution has properly placed in the hands of the executive and legislative, that is, the "political" departments of the national government, and the propriety of whatever may be done in the exercise of this political power is not subject to judicial review or inquiry. Oetjen v. Central Leather Co., 246 U. S. 297, 302, 38 S. Ct. 309, 62 L. Ed. 726; Terrazas v. Donohue (Tex. Civ. App.) 227 S. W. 206. No doctrine of public law is more firmly established than this: That it belongs exclusively to the department constitutionally in charge of the external affairs of the nation to recognize or decline to recognize a new government in an old state or a new state carved out of an old one (Rose v. Himely, 4 Cranch, 241, 272, 2 L. Ed. 608; Gelston v. Hoyt, 3 Wheat. 246, 4 L. Ed. 381; Kennett v. Chambers, 14 How. 38, 14 L. Ed. 316; Gurdus v. Phila. Nat. Bank, 273 Pa. 110, 116 A. 672, 23 A. L. R. 1227) and to determine, in case of recognition, who is the de jure or de facto sovereign in such country. Jones v. United States, 137 U. S. 202, 11 S. Ct. 80, 34 L. Ed. 691; Oetjen v. Central Leather Co., 246 U. S. 297, 38 S. Ct. 309, 62 L. Ed. 726; Agency of Canadian Car & Foundry Co. v. American Can Co., 258 F. 363, 6 A. L. R. 1182 (C. C. A. 2). That determination, when made by the political department of the government, concludes our courts on the legal status of such sovereign or government. Ricaud v. American Metal Co., 246 U. S. 304, 38 S. Ct. 312, 62 L. Ed. 733; Jones v. U. S., 137 U. S. 202, 212, 11 S. Ct. 80, 34 L. Ed. 691; Republic of Peru v. Peruvian Guano Co. (1887) 36 Ch. Div. 489.

"Recognition" is adequately defined as the act by which a state, which is already a member of the community of nations, signifies that it accepts another state as a juristic person of international law, with all the rights and obligations which the law establishes. A. M. Luther v. James Sagor & Co., [1931] 3 K. B. Div. 549. While recognition is not necessary to enable a state to maintain its internal sovereignty (McIlvaine v. Coxe's Lessee, 4 Cranch, 209, 212, 2 L. Ed. 598; Wulfsohn v. Russian S. F. S. Republic, 234 N. Y. 372, 138 N. E. 24; Salimoff & Co. v. Standard Oil Co., 262 N. Y. 220, 226, 227, 186 N. E. 679, 89 A. L. R. 345; Wheaton's International Law, Lawrence's Ed. p. 36), the authorities are nevertheless in accord that it is ordinarily indispensable to make the state's external sovereignty effective, or, to express it differently, to enable the state to become a juristic person of international law. United States v. Hutchings, 2 Wheeler, Cr. Cas. 543, Fed. Cas. No. 15,429; Holland, Lectures on International Law, Walker's Ed., 1933, p. 91; 1 Oppenheim, International Law (4th Ed.) 1928, § 71 p. 143; 1 Louter, Le Droit International Public Positif [1920], p. 218; Visscher, Les Gouvernements etrangers en Justice, Revue de Droit International, Ser. III [1922], v. 3, p. 149; Ullmann, Trattato di Diritto Internazionale Pubblico, tr. by Buzzati, 1914, § 30, p. 184. Recognition clothes a de facto state with an international status (Salimoff & Co. v. Standard Oil Co., 262 N. Y. 220, 227, 186 N. E. 679, 89 A. L. R. 345) and confirms the self-existence of such state (Zeffter, Le Droit International de l'Europe, Bergson's trans. [1883] p. 61). It implies a formal engagement to respect the rights and powers of sovereignty in the new state and to accept its form of government as adequate to express its rational and normal will.

"In recognizing the state, we consequently recognize its legislative capacity;

we accept its legislation, both statutory and consuetudinary, as defining the laws of its national existence sufficiently for international purposes." 1 Lorimer, The Institutes of the Law of Nations (1883) 325. Recognition, moreover, clothes the state recognized with international capacity to enter into diplomatic relations and to conclude treaties (1 Oppenheim, op. cit., § 75d, p. 15), and accepts the validity and efficacy of the acts of the recognized state—be those acts executive, legislative or judicial—and it impresses upon them a retroactive effect from the commencement of the existence of such state or government. Thus, the Supreme Court has said in Oetjen v. Central Leather Co., 246 U. S. 297, 303, 38 S. Ct. 309, 311, 62 L. Ed. 726, that "recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence." In Underhill v. Hernandez, 168 U. S. 250, 253, 18 S. Ct. 83, 84, 42 L. Ed. 456, the court said: "If the party seeking to dislodge the existing government succeeds, and the independence of the government it has set up is recognized, then the acts of such government, from the commencement of its existence, are regarded as those of an independent nation."

The same principle has been accepted by tribunals of respectable authority in other countries. In England, the House of Lords in Lazard Bros. & Co. v. Midland Bank, Ltd., [1933] A. C. 289, decided that: "The effect of such recognition is retroactive and dated back to the original establishment of Soviet rule which was in the 1917 October Revolution, as was held by the Court of Appeal in Aksionairnoye Obschestve A. M. Luther v. James Sagor & Co." In France, the Civil Tribunal of the Department of the Seine in De Mayennec. Jeutel (1926) 55 Clunet, 710, held that: "The effect of the de jure recognition of the Union of the Soviet Socialist Republics, except as it attempts to take away vested rights, is retroactive and goes back to the day of the commencement of the juridical existence of the new government." Protected by the retroactive effect of recognition are also legislative (Murray v. Vanderbilt, 39 Barb. [N. Y.] 140, 146) and executive (Oetjen v. Central Leather Co., 246 U. S. 297, 38 S. Ct. 309, 62 L. Ed. 726; Monte Blanco Real Estate Corp. v. Wolvin Line, 147 La. 563, 85 So. 242) acts of confiscation.

We must take judicial notice of the recognition of the Soviet Government by our government on November 16, 1933 (Jones v. United States, 137 U. S. 202, 11 S. Ct. 80, 34 L. Ed. 691; Underhill v. Hernandez, 168 U. S. 250, 18 S. Ct. 83, 42 L. Ed. 456; Oetjen v. Central Leather Co., 246 U. S. 297, 38 S. Ct. 309, 62 L. Ed. 726; Ricaud v. American Metal Co., 246 U. S. 304, 38 S. Ct. 312, 62 L. Ed. 733; City of Berne v. Bank of England, 9 Ves. 347, 32 Repr. 636; Mighell v. Sultan of Jehore, [1894] 1 Q. B. Div. 149, 158, 161, A. C.; Duff Development Co. v. Govt. of Kelantan, [1924] A. C. 797, H. of Lords), and applying the foregoing principles to the state of facts before us, we are bound by the determination of our political department regarding the international legal status of the Soviet Government; that recognition having been accorded, we must accept the Soviet Government as a legitimate governmental authority in Russia, and its institutions and laws as adequate expressions of the national will to meet the requirements of international law; that the effect of the recognition of that government is to retroact upon and validate for international purposes, all the acts, whether legislative, executive, or judicial, of that government, including the decrees by which the property and assets of the respective insurance companies were affected from October, 1917, when that government came into power.

But, as each nation can legislate only for itself (The Antelope, 10 Wheat. 66, 122, 6 L. Ed. 268), to hold, as we must, that the recognition of the Soviet Government is retroactive and that its actions are validated, in our judgment, does not answer the question on which these cases necessarily revolve, namely, whether the legislation of the Soviet Government, as it affects these insurance companies, should be recognized and applied by our courts so as to vest in the Soviet Government title to the assets of the corporations located here and thus enable that government to assign such title to the United States as it purports to do. That question is not free from intrinsic difficulties, and the studied views of those who have considered and written on the subject, and the obiter dicta of the courts as they have had occasion to comment on it, are far from being in agreement. Realizing that for the first time, perhaps, in the judicial history of this country, the courts have been called upon by a foreign power, with whom we are now in relations of amity, to give extraterritorial effect with respect to property located here, to its admittedly confiscatory

legislation, requires that we approach the subject with caution. That the legislation of each state is local in character and has no force proprio vigore, beyond its jurisdiction, is a principle flowing from and in entire harmony with the dominant conceptions of political science in every land. In the case of The Apollon, 9 Wheat. 362, 370, 6 L. Ed. 111 (1824), Mr. Justice Story said: "The laws of no nation can justly extend beyond its own territories, except so far as regards its own citizens. They can have no force to control the sovereignty or rights of any other nation, within its own jurisdiction. And however general and comprehensive the phrases used in our municipal laws may be, they must always be restricted in construction, to places and persons, upon whom the legislature have authority and jurisdiction." ·

This general principle has been followed down to the present time without any material variation. Canada Southern R. Co. v. Gebhard, 109 U. S. 527, 536, 3 S. Ct. 363, 27 L. Ed. 1020; Huntington v. Attrill, 146 U. S. 657, 659, 689, 13 S. Ct. 224, 36 L. Ed. 1123; Hilton v. Guyot, 159 U. S. 113, 163, 16 S. Ct. 139, 40 L. Ed. 95; Second Russian Ins. Co. v. Miller, 297 F. 404 (C. C. A. 2). It is also accepted in the English courts, Sedgwick Collins & Co. v. Russian Ins. Co., [1925] 1 K. B. Div. 1, 15. The principle is given even a more rigorous application with respect to foreign laws or judgments which are contrary to morals, to public policy or prejudicial to local interest (Bank of Augusta v. Earle, 13 Pet. 519, 589, 10 L. Ed. 274; Vladikavkazsky R. Co. v. New York Trust Co., 263 N. Y. 369, 378, 189 N. E. 456, 91 A. L. R. 1426), or are of a penal character (Baglin v. Cusenier Co., 221 U. S. 580, 31 S. Ct. 669, 55 L. Ed. 863; Huntington v. Attrill, 146 U. S. 657, 667, 13 S. Ct. 224, 36 L. Ed. 1123; Wharton, A Treatise on the Conflict of Laws, 2d Ed. [1881] § 4).

But, within the sphere of the sovereignty enacting it, that legislation is effective to regulate fully the status of all persons and things therein, and to determine the juristic effect of every act or relationship done or established under it. To the full force of this principle, the respective insurance companies had to yield their unqualified assent. They came into being under the laws of an imperial sovereign; they lived many years under the imperium of those laws; and in 1918 a new sovereign power, the legitimacy of which has been explicitly accepted by our government, cut short their lives; it took over their corpus—their properties and assets. Such was the fate of these corporations in territories subject to Russian jurisdiction. As to the fate of the branches of these corporations here, the problem is not simple, for there the acts of the Russian Government may clash with local conceptions of private international law or policy.

That the continuity and conditions of juristic personality depend on the pleasure of the legislator who creates it may safely be admitted. 9 Holdsworth, A History of English Law [1926] p. 48.

In Canada Southern R. Co. v. Gebhard, 109 U. S. 527, 537, 3 S. Ct. 363, 370, 27 L. Ed. 1020, the Supreme Court said: "Whatever disabilities are placed upon the corporation at home it retains abroad, and whatever legislative control it is subjected to at home must be recognized and submitted to by those who deal with it elsewhere. A corporation of one country may be excluded from business in another country (Paul v. Virginia, 8 Wall. 168 [19 L. Ed. 357]), but, if admitted, it must, in the absence of legislation equivalent to making it a corporation of the latter country, be taken, both by the government and those who deal with it, as a creature of the law of its own country, and subject to all the legislative control and direction that may be properly exercised over it at the place of its creation."

And there is no reason why the suppression of a juristic person by the legislative act of a sovereign which created it should be regarded by the courts of other countries as contrary to their public policy. The fortune that betakes a corporation under the law which created and controlled it, betakes in like measure the branch offices both at home and abroad. The reason for this is that a branch office is nothing more, in the eyes of the law, than a prolongation of the life of the foreign corporation, without independent juristic existence of its own. This is the posture taken on repeated occasions with regard to the branch offices of these extinct Russian corporations, by the courts of Poland (Affaire de Julien Muszkat c. Soc. d'Assur. Rossia [1929], Supt. Ct., 58 Clunet, 770, 771); France (Banque generale pour de Commerce etranger c. Jaudon [1924] Trib. civ. Seine, 52 Clunet, 419, 420; Cie. Nord de Moscou c. Phenix Espagnol [1928] Cour d'Appel, Paris, 56 Clunet, 119, 130; Soc. Vairon et Cie. c. Banque de Commerce de Siberie [1928]

Sirey, Rec. Gen., Jour. du Pal., 161, Cour d'Appel, Bordeaux); and Switzerland (Banque internazionale de Commerce de Petrograd S. A. [Succursale de Geneve] c. Hausner [1924] Trib. Federal, 52 Clunet, 488). It is also the position taken by the British courts in Banque Internationale de Commerce de Petrograd v. Goukassow, [1923] 2 K. B. 682, C. A., Scrutton, L. J. And in Lazard Bros. & Co. v. Midland Bank, Ltd., [1933] A. C. 289, Lord Wright said: "English Courts have long since recognized as juristic persons corporations established by foreign law in virtue of the fact of their creation and continuance under and by that law. Such recognition is said to be by the comity of nations. * * * But as the creation depends on the act of the sovereign state which created them, the annulment of the act of creation by the same power will involve the dissolution and non-existence of the corporation in the eyes of English law. The will of the sovereign authority which created it can also destroy it. English law will equally recognize the one, as the other, fact."

The same rule was recognized in Russian Reinsurance Co. v. Stoddard, Jr., Supt. of Ins., 240 N. Y. 149, 154, 147 N. E. 703. But the Court of Appeals of New York, in recent cases, seems to have adopted what may be called the organic theory of juristic personality in opposition to the fictional theory which to this day has held a predominant position in the field of legal philosophy and judicial history and is the theory of our own law. Thus in Petrogradsky M. K. Bank v. National City Bank, 253 N. Y. 23, 28, 170 N. E. 479, 481 (1930), the court said: "We think the plaintiff is not dissolved, but is still a juristic person with capacity to sue." In Severnoe Securities Corp. v. London & Lancashire Ins. Co., Ltd., 255 N. Y. 120, 122, 174 N. E. 299 (1931), a Russian corporation, whose juristic personality was in dispute, was declared to retain "a pallid life as the shade or little more of its former self." In Re People, by Beha (In re Russian Reinsurance Co.), 255 N. Y. 415, 425, 175 N. E. 114 (1931), the Russian corporations were declared to be "still juristic persons." In Salimoff & Co. v. Standard Oil Co., 262 N. Y. 220, 225, 186 N. E. 679, 682, 89 A. L. R. 345 (1933), in speaking of Russian banking and insurance corporations, the court observed that: " * * * corporations nonexistent in Soviet Russia have been, like fugitive ghosts endowed with ex-

traterritorial immortality, recognized as existing outside its boundaries. The juristic person, the Russian corporation, dead in the country which created it, has received juridical vivification elsewhere."

This reasoning, in the cases referred to, coming before the Court of Appeals prior to the recognition of the Soviet Government, might have some theoretical justification, on the ground, possibly, of the technical continuity of the ancient Russian régime (Rose v. Himely, 4 Cranch, 241, 272, 2 L. Ed. 608; Gelston v. Hoyt, 3 Wheat. 246, 4 L. Ed. 381; The Ambrose Light [D. C.] 25 F. 408, 412) and the presumed illegality of the new (Salimoff & Co. v. Standard Oil Co., 262 N. Y. 220, 224, 186 N. E. 679, 89 A. L. R. 345); a view, however, which has not passed unchallenged by high authority (Banque Internationale de Commerce de Petrograd S. A. [Succursale de. Geneve] c. Hausner [1924], Trib. Federal, Switzerland, 52 Clunet, 486). But that the logic of these cases should be extended, as is pretended (Vladikavkazsky R. Co. v. New York Trust Co., 263 N. Y. 369, 378, 189 N. E. 456, 91 A. L. R. 1426), to acts whose legality we have tacitly approved when we recognized the government under whose authority they were done, is clearly a breach of the comity which one nation owes another. So singularly frail is the foundation of such reasoning when applied after an act, e. g. recognition, which necessarily must alter the judicial application of legal theories, that the New York Court of Appeals stands alone on this proposition. In thus holding, it goes against the current of authority, and controlling principles of public international law which nations in relation to mutual friendliness must observe toward each other. Considering the matter as a question of fact—i. e., failure of proof of extinction—and not of legal theory, as the New York courts have done, the House of Lords of England held in 1925 that banking corporations were not dissolved by Russian nationalization decrees of December 14, 1917. Russian Commercial & Industrial Bank v. Comptoir d'Escompte de Mulhouse, [1925] A. C. 112, 134, L. H.; Banque Internationale de Commerce de Petrograd v. Goukassow, [1925] A. C. 150, H. L.

Passing from the imponderables of juristic theory (corporate personality), to its ponderables (corporate assets), we invoke, in a truer and broader sense, the application

of principles of public and private international law which must be made to coexist and to co-operate toward the adoption of a policy of substantial justice.

A practical result of the political sovereignty of each country is the right of each to change its political institutions at discretion, and to legislate concerning its own interests according to its convenience and needs. King of Prussia v. Kuepper's Adm'r, 22 Mo. 550, 66 Am. Dec. 639 (1856); Dougherty v. Equitable Life Assurance Society, 266 N. Y. 71, 83, 193 N. E. 897. Thus, in the exercise of the right accorded to every state by the most widely accepted of all the principles of the law of nations, the Soviet Government nationalized the business of insurance in which these companies were engaged, and confiscated their property. No doubt exists that the operation of the laws of a foreign state often transcend, and necessarily so, their territorial orbit of action. What gives them force in other jurisdictions is the comity between nations which calls on the representatives of each sovereign state to observe a mutual respect in considering the effects of such of their official acts as project themselves into a foreign jurisdiction. Bank of Augusta v. Earle, 13 Pet. 519, 589, 10 L. Ed. 274; Second Russian Ins. Co. v. Miller, 297 F. 404, 409 (C. C. A. 2); Hilton v. Guyot, 159 U. S. 113, 163, 16 S. Ct. 139, 40 L. Ed. 95; Sedgwick Collins & Co. v. Rossia Ins. Co., [1926] 1 K. B. 1, 17, C. A. And, as a general rule, the acts of the recognized government, when invoked by litigants in the forum of a friendly nation, will not be permitted to be impeached. "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." Underhill v. Hernandez, 168 U. S. 250, 252, 18 S. Ct. 83, 84, 42 L. Ed. 456. The reason, of course, is that to permit the validity of those acts to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations. Oetjen v. Central Leather Co., 246 U. S. 297, 304, 38 S. Ct. 309, 62 L. Ed. 726.

Two possible grounds exist for refusing to give the Soviet decree extraterritorial application. One is public policy; the other is its penal character—assuming it is penal. The conception embodying the idea of public policy is wrapped in considerable vagueness as is generally admitted. Hadden v. Barney, 5 Wall. 107, 18 L. Ed. 518; Egerton v. Brownlow, 4 H. L. Cas. 1, 123. The view expressed concerning public policy by these, the highest tribunals of England and the United States, warn against the danger of taking uncertain and unsatisfactory concepts as the deciding yardstick according to which the legislation of the recognized government of Russia is to be accepted or rejected in our courts. Considerations of an international character urge us to accept, with great reluctance, a local conception of public policy as the determining factor in the relations between friendly nations. Is the confiscatory legislation of a recognized government, which produces effects only within its own jurisdiction, and respecting its own nationals or foreigners, per se, against public policy? Certainly not. Speaking of the confiscatory legislation of the state of Georgia in 1782, which expropriated the property of British loyalists, and particularly that of Wright, the provincial governor, during our Revolutionary period, the Lord Chancellor of England, as far back as 1788, said in Wright v. Nutt, 1 H. Blackstone, 138, 149, 126 Repr. 83, 89: "It may be a question for private speculation, whether such a law made in Georgia was a wise or an improvident one, whether a barbarous or civilized institution. But here we must take it as the law of an independent country, and the laws of every country must be equally regarded in Courts of Justice here, whether in private speculation they are wise or foolish."

This original principle has been accepted without question in subsequent adjudications involving our own nationals and nationals of the country putting such legislation into effect. Underhill v. Hernandez, 168 U. S. 250, 18 S. Ct. 83, 42 L. Ed. 456; Oetjen v. Central Leather Co., 246 U. S. 297, 38 S. Ct. 309, 62 L. Ed. 726; Murray v. Vanderbilt, 39 Barb. (N. Y.) 140, 146.

Is such legislation against public policy if it seeks extraterritorial application? Gratuitous expressions in the courts of New York, England, and France give the impression that they would hold—if the occasion arose—that any infringement of the right of private property, which operates upon property situated in those jurisdictions, would be against their public policy. But in close analysis, it will be found that many of those expressions were unnecessary to the decision of the actual ques-

tion before the courts and they do not apply to the specific problem before us. The cases there referred to concern the protection of rights acquired locally, such as the payment of debts, the enforcement of contracts, and the right of succession under the local law, all of which come properly under the operation of well established principles of private international law. On the other hand, there is much authority in the decisions to the effect that there is nothing in the confiscatory legislation of a recognized government which can be against the public policy of the recognizant state, even when the legislation of the former is judged exclusively according to the local conceptions of the latter rather than by general standards. While there is a divergence of opinion on the question whether the Soviet decrees of nationalization are contrary to public policy, it is well to bear in mind the admonition of the Supreme Court in Hadden v. Barney, supra, against the practice of permitting judicial tribunals to decide according to their unchecked discretion what should be the public policy of a nation, particularly on a question of international concern. The known practice of the executive department of the nation pronouncing the public policy of the nation should be controlling upon the courts in such instances.

The public policy of the country may be declared in the Constitution and, if that instrument is silent, the three departments of the government have the power within their respective spheres, to declare what the public policy is; the executive, by proclamation or some other authoritative act; the legislative, by statute; the judiciary, by judicial decisions. The chief executive, acting as the constitutional organ of international relations, may declare, in the course of the administration of the affairs of the nation, its public policy with respect to any question within his legitimate competency. The act of recognition of a foreign government may import the equivalent of a definite declaration of policy which the courts would be bound to notice. Should we for any reason disapprove of the policies of a foreign government which seeks our recognition, we would be within our rights in declining to recognize it on that ground solely. In A. M. Luther v. James Sagor & Co., [1921] 3 K. B. 532, it appears that the Soviet Government had been extended de facto recognition by the British Government. It was contended that the confiscatory decrees of that government were in their nature "so immoral, and so contrary to the principles of justice" as recognized in England, that the courts should disregard them; Lord Scrutton saying: "Should there be any government which appropriates other people's property without compensation, the remedy appears to be to refuse to recognize it as a sovereign state. Then the Courts could investigate the title without infringing the comity of nations. But it is impossible to recognize a government and yet claim to exercise jurisdiction over its person or property against its will."

While we have said that recognition is retroactive and that its effect is to preclude the tribunals of the recognizant state from questioning the validity or legality of the actions of the government recognized, and that it validates, so far as concerns the tribunals of the recognizant state, transfers of property and other transactions which before recognition would have been treated as invalid by those tribunals (1 Oppenheim, International Law, 4th Ed. [1928] § 75d, p. 155; Harvey, The Legal Effects of Recognition in International Law [1928] 82, 87), an important qualification of this general principle must be formulated, and that is that as in the interregnum between the establishment of a foreign government in power and its recognition by this government, it cannot be said to be entitled to any comity and its legislation to any respect (Rose v. Himely, 4 Cranch, 241, 272, 2 L. Ed. 608; Gelston v. Hoyt, 3 Wheat. 246, 4 L. Ed. 381) at our hands, during such period whatever has been done in the courts, with legal finality, must be regarded as res judicata and valid as against the world. So that in establishing a new policy or changing an old one, the act of recognition must be understood to have effect only from the date it actually takes place as to questions which are res judicata and irrevocable, but as to questions which are still pending or not affected with litigation, or which are political in nature, the effect must be understood as from the commencement of such government. Therefore, during the interregnum, the corporations were correctly regarded here (because of the refusal of our courts on grounds of public policy to give effect to the Soviet legislation) as a juristic person, and as such subject to the application of the principles of private international law; the most frequently invoked in these Russian cases having been the lex rei situs and the lex loci contractus. Salimoff & Co.

878

v. Standard Oil Co., 262 N. Y. 220, 186 N. E. 679, 89 A. L. R. 345; Sedgwick Collins & Co. v. Rossia Ins. Co., [1926] 1 K. B. 1; In re Russian Bank for Foreign Trade, [1933] Chancery 745; Egger v. La Baloise-Vie, [1924] Triv. civ. Seine, 52 Clunet, 1006.

In any litigation between private individuals putting in opposition the laws of respective countries the conflict must be resolved according to the rules of private international law. The principle which during such interregnum applied to the branch offices of these corporations in this country, was clearly formulated in the Treaty on International Commercial Law of Montevideo [1889] (art. 6) as follows: "The branches or agencies established in a state by a corporation domiciled in another, shall be considered as domiciled in the place where they do business and subject to the jurisdiction of the local authorities regarding the business which they may do." Under this qualification of the general principle of the retroactivity of the act of recognition, the rights which the Soviet Government acquired here with respect to these companies and their assets under the decree of nationalization must date only from the date of actual recognition—that is, November 16, 1933—but as to what occurred before, the rights of the Soviet Government must be understood as subordinate to and regulated by the principles of private international law to the extent which those principles govern the rights of our nationals or inhabitants acquired under our laws in the course of business with the companies prior to actual recognition. Anything adjudicated by our courts subsequent to the date of actual recognition must, therefore, be treated as void.

When, therefore, the Soviet Government was recognized, the courts lost all right to continue to inject their prerecognition conceptions of public policy into the international panorama in manifest derogation of the express determination of the political department and the clear juridical implications of the act of recognition. As said by Lord Scrutton, L. J., in A. M. Luther v. James Sagor & Co., supra: "But it appears a serious breach of international comity, if a state is recognized as a sovereign independent state, to postulate that its legislation is 'contrary to essential principles of justice and morality.' Such an allegation might well with a susceptible foreign government become a casus belli; and should in my view be the action of the Sovereign through his Ministers, and not of the judges in reference to a state which their Sovereign has recognized. The English Courts act on the rule 'that an intention to take away the property of a subject without giving him a legal right to compensation for that intention is expressed in unequivocal terms.' Central Control Board v. Cannon Brewery Co. [1919] A. C. 744, 752. If it were they must give effect to it, and can hardly be more rigid in their dealings with foreign legislation. Individuals must contribute to the welfare of the state, and at present British citizens who may contribute to the state more than half their income in income tax and super tax, and a large proportion of their capital in death duties, can hardly declare a foreign state immoral which considers (though we may think wrongly) that to vest individual property in the state as representing all the citizens is the best form of proprietary right. I do not feel able to come to the conclusion that the legislation of a state recognized by my Sovereign as an independent sovereign state is so contrary to moral principle that the judges ought not to recognize it. The responsibility for recognition or non-recognition with the consequences of each rests on the political advisers of the Sovereign and not on the Judges."

The Russian decrees extinguished the lives of these companies and appropriated their property and general assets. If those decrees were effective to extinguish their lives abroad as well as at home, why should they not be effective also to take over their property and assets abroad where the companies had branches, to as full an extent as at home, if our political department has made a public declaration of policy with respect to such legislation which validates it, and the rights of those who have claims against the corporations are safeguarded by our courts under the qualification of the principle of retroaction indicated and the established principles of private international law? When, then, our government recognized that of Russia, it also recognized its legislation. By that legislation, the government of the Soviets ended the lives of these corporations and took over their assets. That legislation this court is bound to recognize and apply since November 16, 1933, as to matters res judicata, in as full a measure as our political department has recognized it, and we are foreclosed from further questioning it by the very act of recognition. Recognition changes a policy

of official disfavor into an attitude of graceful acquiescence. To impeach this legislation now in the courts as being against our public policy would clearly trench upon the sphere of the executive who has already decided the matter in a manner that concludes our courts.

As to the question whether the Russian decree is of a penal character, I do not hesitate to say that I cannot so regard it. A statute is penal if it inflicts a penalty for the violation of some of its provisions (Huntington v. Attrill, [1893] A. C. 150, 156, H. of L.; 3 Bouvier's Law Dictionary, Rawle's 3d Rev. 1914, p. 2551), or, if it fixes upon a wrongdoer any extraordinary liability in favor of the person wronged, not limited to the damages suffered. Huntington v. Attrill, 146 U. S. 657, 667, 13 S. Ct. 224, 36 L. Ed. 1123. It is evident that the reported cases do not indicate that they are vitiated with the criminal or tortious elements which these definitions involve. Baglin v. Cusenier Co., 221 U. S. 580, 31 S. Ct. 669, 55 L. Ed. 863, and Lecouturier v. Roy, [1910] A. C. 262, which have been cited by counsel as authority against the retroactivity of the supposedly confiscatory legislation of the French government, must be considered in the light of the French law—the Loi relative au contrat d'association, of July 1, 1901, 63 Bull. des Lois, 12 c. ser., II Sem. (1901), pt. princ., p. 1273) —article 19 of which provides: "The provisions of art. 463 of the penal code shall apply to offenses contemplated by the present law."

That law clearly fell within the terms of the first portion of our definition.

The right of the United States to sue in the national court has been questioned on the ground that the balances claimed by appellant are now, as it is alleged, in process of adjudication in the state courts, and the majority opinion turns upon this question. To uphold the jurisdiction of the state courts, and avoid giving extraterritorial effect to the Soviet decrees, the majority opinion has taken the unwarranted position that the effect of the dissolution of the insurance company upon its assets was to debase the sovereignty of the state to the status of the corporation. The majority opinion reads: "Consequently we must for present purposes take the Soviet Government to have become to all intents and purposes the Russian insurance corporation in Russia which owned the deposit in New York subject to the fulfillment of the conditions upon which the deposit was made with the New York Superintendent of Insurance." This position, of course, reverses law, logic, and fact. It reverses law because the dissolution of the corporation and the nationalization of its property did not lower the Soviet Government to the plane of the private litigant without its express consent; it reverses logic, because such dissolution did not assimilate the Russian Government with a corporation which was legally nonexistent; and it reverses fact because such nationalization could not involve a debasement of sovereignty. On the contrary, the dissolution and nationalization had the effect of absorbing the assets of the corporation into the rest of the public assets and placing them beyond the reach of the processes of the tribunals of foreign states. Article 3, § 2 of the Constitution, says: "the judicial Power shall extend * * * to Controversies to which the United States shall be a Party." Section 24 of the Judicial Code (28 USCA § 41) gives the District Courts original jurisdiction of "all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof authorized by law to sue." The government is clothed with full juristic capacity to come into its own courts, either as a party plaintiff or an intervenor, to protect or claim its lawful rights. Of this there can possibly be no doubt. But it is said that since the state courts first acquired jurisdiction and control over the res, the United States courts lack authority, under the doctrine of jurisdictional priority repeatedly announced by the Supreme Court (Lion Bonding & Surety Co. v. Karatz, 262 U. S. 77, 88, 43 S. Ct. 480, 67 L. Ed. 871; Harkin v. Brundage, 276 U. S. 36, 43, 48 S. Ct. 268, 72 L. Ed. 457; Wabash R. Co. v. Adelbert College, 208 U. S. 38, 28 S. Ct. 182, 52 L. Ed. 379; Farmers' Loan & Trust Co. v. Lake Street Elevated R. Co., 177 U. S. 51, 61, 20 S. Ct. 564, 44 L. Ed. 667; Byers v. McAuley, 149 U. S. 608, 614, 13 S. Ct. 906, 37 L. Ed. 867; Merritt et al. v. American Steel-Barge Co., 79 F. 228 [C. C. A. 8]), to entertain these suits and to proceed therein as prayed. To this general principle which, as has been said, is a principle "of right and of law, and therefore of necessity" (Covell v. Heyman, 111 U. S. 176, 182, 4 S. Ct. 355, 358, 28 L. Ed. 390), and "essential to the dignity and just authority of every court" (Buck v. Colbath, 3 Wall. 334, 341, 18 L. Ed. 257), I, of course, subscribe. But I

880

perceive no conflict between this salutary rule and the suits brought by the United States in its own courts, if the principles of the retroactivity of recognition, and the extraterritoriality of the legislation of a foreign government within the limits already indicated, are regarded in the proper light, and in that light applied to the questions before us.

Upon matters which were res adjudicata on November 16, 1933—the date of recognition of the Soviet Government—under principles of private international law underlying questions of this character, such recognition can have no disturbing effect; upon matters which were pending or not decided with the authority of finality on the date of recognition and which involved the properties or assets of nationalized Russian companies not affected with the application of principles of private international law, it is clear that whatever was done in the state courts was done at the risk of a declaration of nullity, for the courts should have known that they were dealing with the properties or assets of a foreign government whose confiscatory legislation we have approved by the very fact of recognition and by taking an assignment comprising in many instances the fruits of such legislation. Therefore, on the date of recognition the state courts lost jurisdiction and control of the properties and assets in question. The United States was at liberty to proceed in its own courts, without ousting the state courts of jurisdiction, or of delaying or obstructing the state courts in the exercise of their jurisdiction, or of leading to a conflict of authority between the federal and the state courts. Merritt v. American Steel-Barge Co., 79 F. 228 (C. C. A. 8). In other words, and as a limitation to the principle of jurisdictional exclusion on the grounds of priority, the "possession of the officer or court" was discharged (Buck v. Colbath, supra) by the act of recognition, as to those matters or claims not affected with the application of principles of private international law. It was, therefore, within the competency of the District Courts to entertain the suits filed and to issue the injunctive relief prayed by the United States, since section 265 of the Judicial Code (28 USCA § 379), which forbids the federal courts "to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy," must be con-

strued in connection with section 262, Jud. Code (28 USCA § 377), which authorizes the federal courts "to issue all writs not specifically provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the usages and principles of law." Kline v. Burke Const. Co., 260 U. S. 226, 228, 43 S. Ct. 79, 67 L. Ed. 226, 24 A. L. R. 1077. It may not be maintained that, if after November 16, 1933, the state courts lost jurisdiction over the assets of the recognized Russian government, any injunction issuing from a court of the United States would act to stay proceedings in any court of the state within the meaning of the statute. No proceedings can be stayed, no ousting of jurisdiction or custody can occur, no delay or obstruction in the exercise of jurisdiction can take place, no conflict of authority can happen, where lawful jurisdiction is wanting by operation of law.

The decrees should be reversed.